UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MICHAEL E. GARCIA,                    )
                                      )
          Plaintiff,                  )
                                      )
          v.                          ) CIVIL NO. 2:12-CV-27-APR
                                      )
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
          Defendant.                  )


OPINION AND ORDER

This matter is before the court on the petition for judicial
review of the decision of the Commissioner of Social Security
filed by the claimant, Michael E. Garcia, on January 18, 2012.
For the reasons set forth below, the decision of the Commissioner
is **AFFIRMED**.

Background

The claimant, Michael E. Garcia, applied for Disability
Insurance Benefits and Supplemental Security Income benefits on
June 28, 2010, alleging a disability onset date of June 1, 2008.
(Tr. 138) His claim initially was denied on August 26, 2010.
Upon reconsideration, his application for DIB and SSI again was
denied on September 24, 2010.  (Tr. 91-94, 102-106) Garcia
requested a hearing before an Administrative Law Judge.  (Tr. 35)
A hearing before ALJ Edward P. Studzinski was held on January 3,

1

2011, at which Leonard Fisher, Ph.D. testified as the vocational expert and April Warner testified as a witness. (Tr. 70-83) On January 27, 2010, the ALJ issued his decision denying benefits. (Tr. 34-35) The ALJ found that Garcia was not under a disability within the meaning of the Social Security Act from June 1, 2008 through the date he issued his decision. (Tr. 17-28) Following a denial of Garcia's request for review by the Appeals Council, Garcia filed his complaint with this court. (Tr. 4-5)

Garcia was born on September 17, 1979, making him 38 years-old on the date of the ALJ's decision. (Tr. 138-139) He is 5'10" in height and weighed approximately 175 pounds at the time of the hearing. (Tr. 176) Garcia was engaged and resided with his fiancé and her minor son in a rental home. (Tr. 186) Garcia has a GED certificate and last worked as an assembly line worker for a manufacturing company in 2006. (Tr. 176-177)

Garcia has a history of alcohol dependence, cirrhosis of the liver, thrombocytopenia, hepatitis C, and colitis. (Tr. 246-843) On June 18, 2010, Garcia went to Saint Anthony's Hospital complaining of general abdominal pain and nausea that had been developing for about two months and worsening for about two weeks. (Tr. 259, 271, 281) Garcia admitted to consuming alcohol on a daily basis and smoking cigarettes and marijuana occasionally. (Tr. 249, 281) Dr. Jeffrey Kroll administered a Complete Blood Count test for Garcia, revealing a low platelet

count of 19,000. (Tr. 281-282) Due to the alarming platelet count, Dr. Jeffrey Kroll repeated the blood test, which indicated a platelet count of 18,000. (Tr. 282) Dr. Kroll also ordered a CT scan, which showed thickening of Garcia's gallbladder wall as well as evidence of cirrhosis. (Tr. 282) Dr. Kroll prescribed Zofran and Tylenol for Garcia's pain. (Tr. 282) Based on the blood tests, CT scan, and Dr. Kroll's diagnoses, Garcia was admitted to the general floor of Saint Anthony's Hospital for observation. (Tr. 282)

On June 19, 2010, another CT scan and an ultrasound were ordered. (Tr. 285) The repeat CT scan and ultrasound confirmed fatty changes to Garcia's liver. (Tr. 285, 288) The findings also were suggestive of a small polyp within the gallbladder. (Tr. 285, 288)

During a consultation with Dr. Mary O. Ubanwa on the same day, Garcia complained that his pain worsened whenever he tried to "bend down, twist or do any other thing." (Tr. 271) Dr. Ubanwa noted that Garcia took vicodin occasionally. (Tr. 271) Dr. Ubanwa's assessment of Garcia's medical condition included cholecystitis, alcoholic hepatitis, thrombocytopenia, leukopenia, megalocytosis, early cirrhosis, elevated INR, electrolyte abnormalities, acute alcoholism with withdrawal, and hypoalbuminemia. (Tr. 270) Dr. Ubanwa indicated that Garcia's "leukopenia, megalocytosis, and thrombocytopenia are most likely

secondary to the alcohol..." (Tr. 270) Dr. Ubanwa further determined that Garcia definitely had alcoholic hepatitis, the elevated INR was most likely secondary to the alcohol, and that the psychiatry department was consulted for Garcia's withdrawal symptoms upon Garcia's request. (Tr. 270) Further, Dr. Ubanwa reported Garcia would start on Ativan p.r.n. and delirium tremens precautions. (Tr. 270)

On the same day, Dr. Ubanwa referred Garcia to Dr. Seferino Farias for an evaluation of a possible laparoscopic cholecystectomy. (Tr. 264) Dr. Farias noted Garcia had a partially reducible umbilical hernia and slight hepatomegaly. (Tr. 265) Dr. Farias found that Garcia's platelet count had improved to 26,000, and although he found the "CT scan of the pelvis [to be] ... completely useless, [as] it was not done with p.o. or IV contrast," Dr. Farias did observe some ascites in the abdominal cavity. (Tr. 265)

Dr. Farias further noted Garcia's ashen skin tone and that Garcia seemed to be in slight acute distress. (Tr. 265) Dr. Farias reported that Garcia would not be able to be evaluated by any transplant center until he had demonstrated sobriety for at least six months. (Tr. 265) Furthermore, Dr. Farias explained that once Garcia reached nutritional homeostasis and was able to cease drinking alcohol for at least six months he would determine whether Garcia would be able to undergo a cholecystectomy. (Tr.

4

263) Dr. Farias indicated that Garcia would need an immediate infusion of thiamine and folate in order to prevent alcohol withdrawal symptoms. (Tr. 263)

Next, Dr. Omar Nehme evaluated Garcia for his alcoholic liver disease and abdominal pain. (Tr. 249) Dr. Nehme observed that Garcia was not in distress and seemed to be alert, awake, and oriented. (Tr. 250) Dr. Nehme determined that Garcia suffered from end-stage liver disease with elevated ammonia, thrombocytopenia, abdominal pain, and equivocal gallbladder thickening based on the CT scan of the abdomen and pelvis. (Tr. 250) Further, Dr. Nehme agreed with Dr. Farias' assessment to avoid surgery for Garcia's gallbladder and umbilical hernia, as Garcia's other medical issues made the possible surgeries high-risk endeavors. (Tr. 250, 263) Dr. Nehme reported that Garcia would need to have an elective upper endoscopy to screen for varices. (Tr. 250) Furthermore, Dr. Nehme described a "long discussion with [Garcia] about the importance of completely abstaining from any alcohol intake." (Tr. 250) Dr. Nehme repeated the previous doctors' recommendation to begin withdrawal precautions as soon as possible. (Tr. 250) Further, Dr. Nehme suggested Garcia be prescribed Trental if his bilirubin and INR continued to rise. (Tr. 250)

Then, Dr. Vinay K.P. Reddy was consulted for a rheumatology evaluation. (Tr. 251) Dr. Reddy noted Garcia's blood work showed

he tested positive for hepatitis B. (Tr. 251) Dr. Reddy noticed spots on Garcia's skin, some bruising, abdominal distention, and swelling of the legs. (Tr. 251) Again, Dr. Reddy reported Garcia certainly had alcoholic cirrhosis, hepatitis B, a low platelet count, and "all the stigma for alcoholic liver disease." (Tr. 252) Dr. Reddy reported Garcia's ANA test came back positive for lupus. (Tr. 252) Although Dr. Reddy was not too concerned about the positive result, as that was a common test result for patients who suffered from cirrhosis and hepatitis C, he ordered a repeat test because those results were slightly worrisome. (Tr. 252)

Dr. Ray E. Drasga performed the repeat test for Dr. Reddy. Dr. Drasga found not only that Garcia's thrombocytopenia was related to his alcohol use but also that alcohol use was likely the direct cause of Garcia's cirrhosis with hypersplemism. (Tr. 266) Dr. Drasga advised Garcia to stop drinking alcohol immediately and to consult a gastroenterologist for chronic liver disease. (Tr. 266)

On June 20, 2010, Dr. Kim Bolan Simic evaluated Garcia's mental state. (Tr. 254-255) Dr. Simic reported that Garcia admitted to drinking eight to ten beers per day since the age of twenty-five. (Tr. 254) Further, Garcia admitted to having two DUI convictions and that he had court ordered treatment in the past. (Tr. 254) Dr. Simic reported that Garcia explained that he

was frightened by his newfound medical issues, that he wanted to live, that he intended to avoid friends who used alcohol in order to maintain sobriety, and that he was interested in attending outpatient treatment. (Tr. 255-256) Dr. Simic recommended that Garcia be prescribed thiamine and folate. (Tr. 255) Further, Dr. Simic mentioned she would convert Garcia's Ativan prescription to a standing order with p.r.n. Ativan as needed. (Tr. 255-256)

On June 21, 2010, Garcia received a final report ordered by Dr. Farias. (Tr. 287) The final report indicated that although Garcia did not have hepatocellular disease or cholecystitis, his gallbladder was functioning poorly, and the results were consistent with gallbladder dyskinesia. (Tr. 287) Despite Garcia's gallbladder issues, Garcia's medical condition made surgery on his gallbladder both dangerous and unreasonable. After being released from the hospital, Garcia applied for social security benefits on June 28, 2010. (Tr. 138-145)

On June 28, 2010, Garcia returned to the Saint Anthony's Emergency Department after he ran out of his prescribed Ativan and Darvocet medications, which he was taking for abdominal pain. (Tr. 411-412) The nurse at the Emergency Room contacted St. Clare Clinic, which scheduled an appointment for June 30, 2010 in order to refill the prescriptions. (Tr. 411-412) At his appointment at St. Clare Health Clinic, Garcia received a prescription for

Darvocet and was told to stop smoking, to avoid heavy lifting, and to consult Dr. Nehme and Dr. Farias. (Tr. 378)

Garcia returned to St. Clare Health Clinic on July 13, 2010, complaining of increased abdominal pain despite the pain medications. (Tr. 623) Garcia also complained that he was unable to sleep due to the abdominal pain. (Tr. 623) The treating clinician noted that Garcia was guarding his abdomen and that he appeared anxious, nauseous, and forgetful. (Tr. 623) Garcia was prescribed Percocet, Darvocet, and Xanex. (Tr. 623)

Garcia's Opening Brief states that he returned to St. Clare Health Clinic on July 22, 2010 and July 27, 2010 complaining of abdominal pain and weakness. (Tr. 621-622) The clinician at St. Clare Health Clinic noted that Garcia had ascites, prescribed Aldactone, and dismissed Garcia as a candidate for Interferon treatment for his Hepatitis C because his medical condition was too severe for treatment. (Tr. 621-622)

On July 29, 2010, Garcia was referred to Dr. Gary M. Durak, a clinical psychologist, by the Disability Determination Office of the Social Security Department of the State of Indiana for a mental status examination. (Tr. 512) Dr. Durak found that Garcia was able to groom, dress, and bathe himself. (Tr. 514) Also, Dr. Durak noted Garcia could do simple cooking, very light cleaning, and very, very light shopping. (Tr. 514) Garcia told Dr. Durak that all of his daily activities were slower due to significant

pain and exhaustion and that he experienced problems with mobility in the following areas due to significant pain: walking, standing, sitting, stair climbing, balancing, bending, twisting, kneeling, squatting, lifting, reaching, grabbing, holding, laying down, and sleeping before he was prescribed sleep medications. (Tr. 514) Further, Garcia told Dr. Durak that he got up between 4:00 A.M. and 6:00 A.M. on a typical day and would watch television, check mail, read, care for his girlfriend's son, do crossword puzzles, take light walks, or work on his computer throughout the day. (Tr. 514) Based on the assessment, Dr. Durak diagnosed Garcia with adjustment disorder with depressed and anxious mood and severe medical problems, but he found that Garcia was capable of managing his funds. (Tr. 515)

On August 10, 2010, Garcia was referred to Dr. Mohammad Rahmany for testing by the State of Indiana Disability Determination Bureau. (Tr. 517-520) Dr. Rahmany found Garcia had a history of heavy alcohol abuse, clinical and laboratory evidence of alcoholic cirrhosis, thrombocytopenia, and hepatitis C. (Tr. 519) Further, Dr. Rahmany noted that Garcia had not been treated for Hepatitis C and that Garcia was unable to have a liver biopsy due to his medical condition. (Tr. 519) Dr. Rahmany was under the impression that Garcia "could be considered for a liver transplantation. He [was] currently unable to do functional activity . . . [and] cannot do any labor work." (Tr.

519) Also, Dr. Rahmany explained that Garcia had developed cirrhosis with complications as well as an enlarged liver. (Tr. 519) Dr. Rahmany diagnosed Garcia with Hepatitis C, cirrhosis with complications, and chronic alcohol abuse. (Tr. 519)

On September 3, 2010, Garcia was admitted to the Saint Anthony's Emergency Department complaining of abdominal pain that had worsened over the preceding couple of days. (Tr. 630) Garcia's platelet count was 31,000. (Tr. 634) Garcia had a CT scan which showed "moderate wall thickening in the cecum and proximal ascending colon, possible colitis, marked gallbladder wall thickening with enhancement of the inner wall, chronic more likely than acute." (Tr. 634) Dr. Scott Kanagy, D.O. noted that most of Garcia's pain was in the right mid and right lower quadrant, but not in his gallbladder. (Tr. 634) Dr. Kanagy stated that Garcia had a small umbilical hernia containing fat, trace pelvic ascites, and bladder wall thickening. (Tr. 634) Garcia required morphine to manage his pain, but he remained stable in the Emergency Room. (Tr. 634) Dr. Kanagy diagnosed Garcia with acute colitis and thrombocytopenia and admitted him for twenty-three hour care under Dr. Bernardo Lucena's supervision. (Tr. 634)

On September 4, 2010, Garcia had a routine gallbladder ultrasound performed. (Tr. 639) The ultrasound showed a few small polyps on the gallbladder, that the walls of the

gallbladder were slightly thicker than normal, and a trace amount of pericholecystic edema. (Tr. 639) The attending physician suggested that a HIDA scan would provide useful information, but found that the sonographic findings were concerning for low grade cholecystitis. (Tr. 639) However, Dr. Lucena stated that Garcia could not tolerate the necessary pain medications in preparation for a HIDA scan. (Tr. 642) Also, Dr. Lucena determined that Garcia's abdominal pain was secondary to the colitis and possibly the presence of a cholecystitis, his liver cirrhosis was secondary to alcoholism, and his thrombocytopenia was secondary to his portal hypertension/splenomegaly. (Tr. 643) Dr. Lucena noted that he believed Garcia also had lupus erythematosus. (Tr. 643)

On September 5, 2010, Dr. Peter G. Mavrelis described Garcia as a "chronically ill 40-year-old gentleman." (Tr. 640) Dr. Mavrelis noted that he would consider performing a colonoscopy on Garcia in a week once his platelet count had improved. (Tr. 640) Garcia was discharged on September 7, 2010 and advised to follow up. (Tr. 628-629)

In a letter dated September 10, 2010, Dr. Lucena wrote that Garcia "is considered disabled and unable to perform any functions." (Tr. 524) Further, Dr. Lucena explained that Garcia was physically limited due to his pain and fatigue. (Tr. 524) Dr. Lucena also mentioned that Garcia was unable to stand for

more than thirty minutes and was unable to lift anything over twenty pounds due to his hernia. (Tr. 524) Additionally, Dr. Lucena described Garcia's condition as "chronic and terminal" and noted that Garcia would be "unable to return to any form of employment." (Tr. 524)

On September 14, 2010, Dr. Nehme stated that Garcia had remained abstinent from alcohol intake since his last visit in June. (Tr. 713) Dr. Nehme further stated that his plan was to refer Garcia to a medical center to initiate a potential transplant work-up so long as Garcia abstained from alcohol consumption but that the surgery would be associated with high risk of liver decompensation. (Tr. 713) Dr. Nehme also planned on having a surgical evaluation at the medical center for possible cholecystectomy and hernia repair. (Tr. 713) On September 20, 2010, Dr. Drasga recommended setting Garcia up with an appointment at Indiana University Medical Center for a possible evaluation of chronic liver disease after a follow up appointment with Garcia. (Tr. 720)

On September 21, 2010, B. Randal Horton, Psy.D. noted that he had reviewed Garcia's file and affirmed the assessment of August 26, 2010, in which the Social Security Administration denied Garcia benefits. (Tr. 610) On September 22, 2010, Garcia was seen at St. Clare Health Clinic before going to Indianapolis for the medical center examination, and he was told to stop

taking all pain medications in preparation for the transplant assessment. (Tr. 619) On September 28, 2010, Garcia was seen by Dr. Michael G. House at Clarian Health Indiana University Hospital. (Tr. 709) Dr. House decided to admit Garcia to do a workup of his underlying liver disease and to determine the etiology for his abdominal pain. (Tr. 710) Dr. House mentioned that Garcia suffered from severe pain which prevented him from "having any sort of functional lifestyle." (Tr. 709) Dr. House recommended that Garcia see Dr. Mehta from Hematology Services to evaluate Garcia's chronic thrombocytopenia. (Tr. 710) Dr. House ordered a CT scan of Garcia's abdomen and pelvis. (Tr. 710) Garcia was discharged on October 2, 2010, with instructions to continue previous medications. (Tr. 728-729)

On November 2, 2010, Garcia returned to Dr. House for a clinic visit due to increased pain associated with his hernia. (Tr. 724) Dr. House determined that Garcia's symptoms were related to his reducible umbilical hernia. (Tr. 724) After explaining the potential major risks associated with performing a surgery to Garcia, Dr. House obtained Garcia's informed consent and ordered Garcia to make arrangements for operations within three weeks despite his cirrhosis and thrombocytopenia. (Tr. 724)

On November 16, 2010, Dr. Nehme had a follow up appointment with Garcia. (Tr. 718) Dr. Nehme noted Garcia was scheduled to

have "IV IG infusions by hematology for his thrombocytopenia."
(Tr. 718) Dr. Nehme also stated he would like to check Garcia's
platelet levels and continue to evaluate his platelet levels
prior to surgery that was scheduled to take place in December at
IU Medical Center. (Tr. 718)

On December 7, 2010, Dr. Lucena completed a Medical
Assessment of Ability to do Work-Related Activities form on
behalf of Garcia. (Tr. 613-615) Dr. Lucena stated that Garcia's
ability to lift or carry was limited by his condition and that
Garcia could carry no more than ten pounds for up to one-third of
a regular work day and no more than five pounds for up to two-
thirds of a regular work day. (Tr. 613) Dr. Lucena further
stated that Garcia's ability to stand was limited by his
condition and that Garcia was incapable of standing and walking
for more than thirty minutes in an eight hour work day. (Tr.
613) However, Dr. Lucena also stated Garcia's ability to sit was
not limited by his condition. (Tr. 614) In Dr. Lucena's opinion,
Garcia was unable to perform postural activities including
climbing, stooping, crouching, kneeling, crawling, bending, or
twisting, and he was unable to balance for more than one-third of
an eight hour work day. (Tr. 614) Further, Dr. Lucena explained
that several of Garcia's physical functions were affected by his
constant pain and weakness, including reaching, handling,
feeling, pushing, pulling, and speaking. (Tr. 614) Additionally,

Dr. Lucena stated Garcia's condition imposed limitations on exposure to various environmental restrictions including heights, moving machinery, temperature extremes, chemicals, dust, fumes, and humidity.  (Tr. 614) Also, Dr. Lucena noted that Garcia required at least one hour of rest every thirty minutes to an hour during an eight hour work day.  (Tr. 615)

On January 10, 2011, Garcia received a laparoscopic cholecystectomy as well as an umbilical hernia repair.  (Tr. 728) Garcia's Discharge Summary regarding this surgery stated Garcia "tolerated the procedure well.  There were no immediate postoperative complications . . . However; his hospitalization was prolonged to postoperative day two."  (Tr. 728) Garcia was discharged on postoperative day two, or January 14, 2011, with stable vital signs and well-controlled pain.  (Tr. 728)

On June 12, 2011, Garcia was transferred to IU Medical Center from OSH where he complained of chest pain, dyspnea, and fever.  (Tr. 781) Before arriving at IU Medical Center, Garcia had received a chest tube for drainage of about 2,490 L.  (Tr. 781) Garcia complained of abdominal pain, constipation, and pain at the chest tube site when he arrived at IU Medical Center. (Tr. 781) On June 13, 2011, Garcia's treating physician noted Garcia might have multifocal community acquired pneumonia.  (Tr. 784)

At the hearing before the ALJ, Garcia testified that he was forty-one years old and that he weighed about one hundred and eighty-six pounds, which he said was a "bit above [his] normal" weight. (Tr. 44) Garcia also testified that he lived with his fiancé, April Warner, and her 11-year-old son, Matthew, in a rental house. (Tr. 46) Garcia recently received his driving license back after it was suspended for over eleven years. (Tr. 46) Garcia explained that he did not drive too often, unless he took his fiancé to work or had to go to a doctor appointment. (Tr. 46)

Garcia testified that he worked for Scientific Window as a window installer from about 1998 until about 2002. (Tr. 52) During the time he was employed at Long John Silvers, Garcia was incarcerated for DUI charges. (Tr. 53) Garcia explained that he had been incarcerated about fifteen times for minor alcohol related offenses. (Tr. 53) Garcia testified that in 2006 he worked full time on a manufacturing line for Reader Automotive, North America. (Tr. 51) Garcia further testified that he received his last paycheck from Thomas Construction in the spring of 2008 and that he was currently not working. (Tr. 47) While working for Thomas Construction, Garcia earned about $3,000 for three months of work including roofing, siding, and carpentry. (Tr. 48) Garcia further testified that he was missing about two or three days out of the week while he was working at Thomas

Construction due to stomach, knee, elbows, and other extremity pain. (Tr. 48, 56) Furthermore, Garcia testified that Thomas Construction "folded" in 2008. (Tr. 54) Garcia explained that even if the company had not "folded," he likely would not have continued to work for Thomas Construction because he did not think that he was making enough money. (Tr. 54) Garcia said that after he received his last paycheck from Thomas Construction he had a few odd jobs, such as mowing lawns, but he was not receiving any income or workers' compensation at the time of the hearing. (Tr. 48)

Garcia further testified that his condition had worsened since 2008. (Tr. 57, 68) Garcia explained that he has had "trouble getting out of bed from everything to taking a shower to dressing [himself], to making something to eat. [Even] [t]ying [his] shoes . . ." (Tr. 57) Garcia explained that the constant stomach pain he experienced prevented him from comfortably walking, standing, sitting, and changing positions. (Tr. 57, 67) Garcia further explained that he was experiencing an intense combination of severe burns, stabs, aches, and pains in his stomach. (Tr. 58, 66) Garcia testified that after about an hour of sitting, he had to stretch his legs for a couple of minutes because he became unbearably uncomfortable. (Tr. 60) Garcia explained that being able to sit all day and stretch every hour or so would be a good day for him, and that five out of seven

days a week, he typically needed to lie down in order to relieve any of his symptoms. (Tr. 61) Garcia said that his doctors had instructed him to lie down and that lying down did not fully relieve his symptoms. (Tr. 61) Garcia also testified that he could walk only about thirty yards without becoming breathless. (Tr. 62)

Garcia testified that he had not consumed any alcohol since June 18, 2010, but that he was drinking alcohol during the time that he was working. (Tr. 48) While working for Scientific Window, Garcia did not drink on the job, but he considered himself to be a heavy drinker during that time. (Tr. 53) Garcia explained that while he was working for Reader Automotive, he did not drink as often during the day because he spent more time around his bosses than in his other jobs. (Tr. 51) Garcia said that during the time that he worked for Thomas Construction, he was drinking about twelve beers per day and about a couple of shots of whiskey per week. (Tr. 49) Garcia explained that he used to smoke marijuana occasionally but that he did not smoke marijuana anymore. (Tr. 50) Further, Garcia said that he quit drinking after a visit to the hospital on June 18, 2010, and that he did not go through any treatments or programs to assist him in quitting alcohol. (Tr. 50) Once Garcia had quit drinking for a six month period, he likely would be eligible to be placed on a transplant list. (Tr. 70)

Additionally, Garcia testified that he typically left his house only to get the mail but that he occasionally would go see a movie or shop for groceries. (Tr. 63) Garcia explained that he rarely left the house to see friends and family but that his friends, family, and ex-coworkers would visit him at his home. (Tr. 63) Garcia further testified that he no longer could play softball in his old leagues, did not do any chores around the house, and spent most of his time lying down, watching television, and watching over Matthew. (Tr. 64) On a typical day, Garcia would get up around noon, take a shower, make himself something to eat, watch television, and then lay around on a couch the rest of the day. (Tr. 64)

April Warner testified at the hearing as a witness. (Tr. 70) Warner stated that she had been living with Garcia for ten years, that Garcia had stopped drinking, and that she could tell Garcia was in pain because he was in bed a lot more and was far less active. (Tr. 71) Warner further stated that Garcia had awakened in the middle of the night moaning and crying from pain for about five or six months. (Tr. 71)

VE Leonard Fisher, Ph.D., was the last to testify. (Tr. 72) The ALJ asked the VE to identify the exertional and skill level of Garcia's past work performed within the last fifteen years as actually and generally performed. (Tr. 77) The VE responded that Garcia was a product assembler, which was semiskilled according

to the DOT and a medium exertional level; a roofer, which was skilled according to the DOT and a medium exertional level; and a window installer, which was skilled according to the DOT and a medium to heavy exertional level. (Tr. 77)

The ALJ posed a series of hypothetical questions. (Tr. 78-83) First, the ALJ asked the VE about the existence of jobs at a light level for a person of Garcia's age, education, and work experience who was able to lift a maximum of twenty pounds occasionally and ten pounds more frequently; could stand and walk six hours out of an eight hour day; had postural limitations such that he never should climb ladders, ropes, or scaffolds; was unable to crawl; and, due to the individual's pain and medication, could not operate dangerous moving machinery, was to avoid all work at unprotected heights, or where he might be exposed to unguarded dangerous machinery. (Tr. 78) The VE responded that an individual with those limitations could not perform Garcia's past assembly work as generally performed, and there was no past relevant work to the first hypothetical. (Tr. 79) At the unskilled level, the individual could be an electronics worker (9,600 Indiana jobs and 200,000 national jobs), an inspector (20,000 Indiana jobs and 400,000 national jobs), or a parking lot attendant (5,300 Northwest Indiana/Chicago jobs and 100,000 national jobs). (Tr. 79)

The ALJ's second hypothetical assumed the individual described in the first hypothetical situation was limited to a sedentary level work. (Tr. 79) The ALJ asked whether that individual would be able to perform any jobs subject to those postural and environmental limitations. (Tr. 79) The VE responded that an individual with those limitations would be able to do work including, but not limited to, that of a surveillance monitor (1,500 Chicago jobs and 81,000 national jobs), food and beverage order clerk (8,000 Northwest Indiana/Chicago jobs and 200,000 national jobs), or a charge account clerk (5,700 Northwest Indiana/Chicago jobs and 200,000 national jobs). (Tr. 80)

The third hypothetical the ALJ posed assumed all of the same factors and limitations in as the last hypothetical with additional postural limitations, such as the individual would be unable to perform more than occasional stooping, kneeling, or crouching. (Tr. 80) The VE responded that these additional postural limitations would not preclude the individual's performance of the jobs that were just identified. (Tr. 80) The ALJ also asked whether those jobs described in this hypothetical would allow an individual to alternate his seated position briefly at one hour intervals. (Tr. 81) The VE responded in the affirmative. (Tr. 81)

The fourth hypothetical the ALJ posed assumed all of the same factors and limitations in the last hypothetical with additional mental limitations due to any medication and pain. (Tr. 80) Further, the ALJ added that the individual would be limited to simple, routine, repetitive tasks that involved no more than occasional decision making, no more than occasional changes in the work setting, and only the occasional exercise of judgment on the job. (Tr. 80) The VE responded that the individual would not be able to perform any jobs, even simple ones. (Tr. 80) The ALJ then changed the hypothetical to describe only simple, routine, and repetitive tasks and questioned whether that would permit the performance of the jobs previously identified. (Tr. 82) The VE responded in the affirmative. (Tr. 82)

Finally, the ALJ asked how many unexcused absences or unscheduled absences an employer generally would allow per month. (Tr. 82) The VE responded that based on factors such as loyalty, competency, and other skills, if an individual missed more than one work day per month, he would have difficulty sustaining competitive employment. (Tr. 82)

In his decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 17-27) In step one, the ALJ found that Garcia had not engaged in substantial gainful activity since June 1, 2008,

the alleged onset date. (Tr. 19) At step two, the ALJ found that Garcia had the following severe impairments: cirrhosis of the liver, thrombocytopenia (low platelet), hepatitis C, colitis, and history of alcohol dependence. (Tr. 20) At step three, the ALJ found that Garcia did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20) In particular, Garcia's physical impairments did not meet the requirements of listing 5.05, 5.06, or 7.06. (Tr. 20-21) With regard to Garcia's medical impairments, the ALJ found that Garcia's daily living activities were only mildly restricted, he only had mild difficulties in social functioning and with regard to concentration, persistence or pace, and he did not suffer any episodes of decompensation. (Tr. 22) Thus, Garcia's mental impairment did not meet or medically equal the criteria of listing 12.09, paragraph B, as Garcia's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation. (Tr. 21-22)

In determining Garcia's RFC, the ALJ stated that he considered the entire record and found that Garcia had the residual functional capacity to perform sedentary work except: "claimant is unable to climb ladders, ropes or scaffolds, crawl, drive moving vehicles, operate dangerous machinery or work around

unprotected heights." (Tr. 22) The ALJ further stated that Garcia was able to stoop, kneel, and crouch occasionally. (Tr. 22) The ALJ also explained that Garcia needs to be permitted to change positions from sitting or standing every hour, and was limited to simple, routine, and repetitive tasks. (Tr. 22)

In reaching this determination, the ALJ first discussed Garcia's symptoms and whether those symptoms reasonably could be accepted as consistent with medical evidence, opinion evidence, and other evidence presented. (Tr. 22) The ALJ followed a two-step process in which he (1) determined whether there was an underlying medically determinable physical or mental impairment, and (2) evaluated the intensity, persistence, and limiting effects of Garcia's symptoms to determine the extent to which they limit the claimant's functioning. (Tr. 23) Garcia alleged a disability in his initial application due to cirrhosis of the liver, lupus, and hepatitis C. (Tr. 23) Garcia testified at the hearing that his impairments caused him to suffer from severe chronic pain above his colon, which he rated as an eight on a ten point scale, and also prevented him from any activities involving bending, stooping, or performing simple daily activities. (Tr. 23) Garcia further testified that he suffered pain in his knees and elbows, which was not evaluated by a doctor; he had quit drinking in June of 2010, but used to drink about a twelve-pack of beer per day and two or three shots of whiskey per week; he

could sit for an hour before getting agitated; he could stand for about an hour; he could lift about a gallon of milk; and he could walk about thirty yards before becoming breathless. (Tr. 23) The ALJ determined that Garcia's medically determinable impairments reasonably could be expected to cause the alleged symptoms. However, the ALJ found that Garcia's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible, as they were inconsistent with the residual functional capacity assessment. (Tr. 23)

The ALJ considered the fact that the record indicated that Garcia was not receiving medical care for his impairments at the time of the alleged onset date in June of 2008. (Tr. 23) The medical evidence began on June 18, 2010, when Garcia went to St. Anthony's Hospital due to epigastric abdominal pain, upper quadrant abdominal pain, and nausea. (Tr. 23) At that hospital visit, Garcia admitted he had a history of drinking excessive amounts of alcohol on a daily basis and that he consumed alcohol earlier in the day. (Tr. 23) On June 22, 2010, he was discharged from the hospital with diagnoses of end-stage liver disease secondary to alcoholism, severe thrombocytopenia without evidence of bleeding secondary to end-stage liver disease, biliary dyskinesia, hepatitis C, and a history of chronic alcoholism. (Tr. 23) Upon being discharged, Garcia was told to stop drinking alcohol and smoking tobacco, especially because he would need to

stop drinking for six months prior to any evaluation by a transplant center.  (Tr. 23)

In September of 2010, the record indicated that Garcia's lymph nodes were biopsied at Indiana University Medical Center due to his chronic abdominal pain.  (Tr. 23) The biopsies failed to detect any sign of lymphoma or cancer.  (Tr. 23-24) A CT scan of Garcia's abdomen revealed a distended gallbladder with minimal pericholecyslic fluid, and January 10, 2011 medical records received after the hearing indicated that Garcia underwent a laparoscopic cholecystectomy and an open umbilical repair with mesh at St. Clare Clinic.  (Tr. 24) Garcia was discharged on January 14, 2011 in stable condition with prescriptions for pain medications.  (Tr. 24) The ALJ recognized that the record indicated that Garcia was diagnosed with colitis after a CT scan was performed in September of 2010 at St. Anthony's Hospital. (Tr. 24)

The ALJ stated that he did not fully credit Garcia's allegations.  (Tr. 24) The ALJ explained that he found the record to contain no evidence of disability as of the alleged onset date in June of 2008.  (Tr. 24) The ALJ further explained that he found the medical evidence to indicate that the claimant continued to drink heavily throughout 2010 and sought treatment in June of 2010, two years after the onset date.  (Tr. 24) The ALJ found that Garcia's drinking was a factor for at least a good

part of his alleged period of disability. (Tr. 24) Garcia
further testified that he did not stop working in 2008 because of
his disability, but because the company went out of business.
(Tr. 24) The ALJ determined that the record indicated that Garcia
had admitted he was not disabled as of the alleged date of onset.
(Tr. 24) Further, the ALJ found that the evidence indicated
Garcia worked for cash doing part-time work after August of 2008,
Garcia was lifting and carrying heavy things while working
construction as recently as June of 2010, and Garcia considered
himself capable of attempting demanding tasks. (Tr. 24) Based on
this evidence, the ALJ determined Garcia could perform
significantly less demanding work consistent with the earlier
assessment of residual functional capacity. (Tr. 24)

    The ALJ went on to discuss Garcia's testimony regarding his
physical capabilities. (Tr. 24) At the hearing, Garcia testified
that he could sit and stand for an hour, was able to lift a
gallon of milk, and could drive about thirty-five to forty
minutes. (Tr. 24) In August of 2010, Garcia's primary doctor
reported Garcia had no ascites in his abdomen. (Tr. 24) Garcia
further testified that he spent the majority of the day lying
down and stretching, but the record did not indicate there was
medical evidence to support Garcia's need to lie down on a
regular basis. (Tr. 24) Based on this testimony and evidence,
the ALJ rejected the allegations that Garcia needed to lie down

and stretch for the majority of the day. (Tr. 24) The ALJ further determined, based on the evidence and testimony presented, that Garcia exaggerated the severity of his pain because the record did not document that he sought medical attention and management as would reasonably be expected of a person experiencing pain at an eight out of a ten point scale. (Tr. 24) Although Garcia's testimony and the medical evidence indicated that Garcia's medications caused fatigue, the ALJ explained his limitation on Garcia to simple, routine, repetitive tasks accommodated for the effect his medication had on him throughout the day. (Tr. 25)

The ALJ next considered the opinion evidence on record. (Tr. 25) First, the ALJ discussed the medical consultant, Dr. Robert Bond's, opinion that Garcia's impairments were not severe. (Tr. 25) The ALJ gave Dr. Bond's opinion little weight as the updated medical records from St. Anthony's Hospital, St. Clare Clinic, IU Medical Center, and Dr. House all indicated that Garcia suffered from cirrhosis of the liver, thrombocytopenia, hepatitis C, and colitis. (Tr. 25) Next, the ALJ discussed Garcia's physical consultative examination on August 10, 2010 with Dr. Rahmany. (Tr. 25) Dr. Rahmany opined that Garcia was unable to do functional activity and could not do any labor work due to his cirrhosis and hepatitis C. (Tr. 25) The ALJ gave Dr. Rahmany's opinion little weight because the ALJ determined it was

inconsistent with the record as a whole. (Tr. 25) The ALJ

explained that Dr. Rahmany found that Garcia had no abdominal

pain, nausea, vomiting, or hematemesis; had no swelling,

stiffness, or effusion in the upper or lower extremities; had

normal strength in all muscle groups; was able to walk with a

stead gait; could stoop and squat without difficulty; could walk

heel to toe and tandem walk without difficulty; and was able to

stand from a sitting position without difficulty. The ALJ

believed that these findings were inconsistent with a finding of

disability. (Tr. 25) Additionally, the ALJ noted the finding of

a disability was a matter reserved to the Commissioner. (Tr. 25)

Next, the ALJ discussed Garcia's treating physician, Dr.

Lucena's, September 10, 2010 opinion that Garcia was unable to

stand for more than thirty minutes at a time or lift anything

over twenty pounds. (Tr. 25) The ALJ stated that he considered

the administrative findings of fact made by the treating

physician, relied upon them in determining Garcia's residual

functional capacity, and gave considerable weight to Dr. Lucena's

opinions regarding Garcia's functional limitation as they were

consistent with a limited range of sedentary work and were

supported by the objective evidence. (Tr. 25) However, the ALJ

gave no weight to Dr. Lucena's opinion that Garcia was considered

disabled and unable to perform any functions because the finding

of disability was a matter reserved to the Commissioner.  (Tr. 25)

Next, the ALJ discussed the Medical Assessment of Ability to do Work-Related Activities completed by Dr. Lucena on December 7, 2010 regarding Garcia.  (Tr. 25) In this statement, Dr. Lucena opined that Garcia was able to carry five pounds frequently and ten pounds occasionally, stand for less than one-half hour in an eight hour work day, and stand and walk without interruption for less than one-half hour.  (Tr. 25) Additionally, Dr. Lucena stated that Garcia was unable to climb, balance, stoop, crouch, kneel, crawl, bend, or twist.  (Tr. 25) Further, Dr. Lucina opined that Garcia was able to balance occasionally, but that he had an impaired ability to reach, handle, feel, push/pull, see, and speak.  (Tr. 25)  Dr. Lucena further found that Garcia should be restricted in his exposure to heights, moving machinery, extreme temperatures, chemicals, dust, fumes, and humidity and that he would need one thirty to sixty minute period of rest during an eight hour period.  (Tr. 25) The ALJ rejected these opinions and gave them little weight because he found they were inconsistent with the record as a whole.  (Tr. 25) The ALJ explained that Dr. Lucena did not explain why Garcia's restrictions were far greater in his December 7, 2010 evaluation as compared to his September 10, 2010 assessment.  (Tr. 25-26) Additionally, Dr. Lucena did not provide any findings to support

his opinions. (Tr. 26) Furthermore, Dr. Lucena offered no evidence that these limitations dated back to the alleged onset date or that they had lasted for at least twelve months. (Tr. 26)

The ALJ went on to discuss April Warner's testimony. (Tr. 26) Warner testified that Garcia stayed in bed a lot during the day and woke up in the middle of the night in tears due to pain. (Tr. 26) Warner also completed a Third Party Function Report on July 6, 2010 in which she alleged Garcia had difficulty performing daily living activities such as mowing the lawn, lifting heavy objects, or playing sports due to abdominal pain. (Tr. 26) The ALJ gave Warner's opinions some weight, but he disregarded Warner's statements regarding Garcia's functional limitations that conflicted with the above residual functional capacity. (Tr. 26) Thus, considering the totality of the medical, testimonial, and opinion evidence, the ALJ concluded that Garcia had the residual functional capacity to perform at the sedentary level due to cirrhosis of the liver. (Tr. 26) The ALJ further found Garcia was unable to climb ladders, ropes, or scaffolds; crawl; drive moving vehicles; operate dangerous machinery; or work at unprotected heights. (Tr. 26) Additionally, the ALJ determined Garcia could stoop, kneel, and crouch occasionally; needed to change positions from sitting or standing every hour due to the cirrhosis and colitis; and was

limited to simple, routine, and repetitive tasks due to fatigue caused by pain medications and alcohol dependence. (Tr. 26)

With the RFC determined, at step four the ALJ found that Garcia could not perform his past relevant work. (Tr. 26) At step five, the ALJ found that considering Garcia's age, education, work experience, and RFC, there were a significant number of jobs available in the national economy that he could perform, including surveillance systems monitor (1,500 jobs regionally and 81,000 jobs nationally), order clerk (8,000+ jobs regionally and 200,000+ jobs nationally), and charge account clerk (5,700+ jobs regionally and 200,000+ jobs nationally). (Tr. 27) The vocational expert defined the region as metropolitan Chicago area and Northwest Indiana. (Tr. 27)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)(2006)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to

support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852 (1971) (quoting ***Consolidated Edison Company v. NLRB***, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* ***Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. ***Roddy v. Astrue***, 2013 WL 197924, No. 12-1682 (7th Cir. 2013); ***Rice v. Barnhart***, 384 F.3d 363, 368-369 (7th Cir. 2004); ***Scott v. Barnhart***, 384 F.3d 363, 368-69 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months. **42 U.S.C. § 423(d)(1)(A)**.

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20**

**C.F.R. §§ 404.1520, 416.920.** The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b).** If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c).** Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1.** If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity' (RFC) and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e).** However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work experience and functional capacity to work, is capable of performing other work

and that such work exists in the national economy.  **42 U.S.C. §
423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

Garcia raises three challenges to the ALJ's denial of
disability benefits.  First, Garcia argues that the ALJ made an
erroneous RFC determination because he did not give his treating
physician's opinions great weight in the RFC determination, nor
did he properly assess the opinion of the individual consultative
examiner and other medical evidence of record.  Next, Garcia
argues that the ALJ's finding that Garcia, in light of his age,
education, job experience and functional capacity to work, was
capable of performing other work, and that such work existed in
the national economy, was erroneous.  Finally, Garcia argues that
the ALJ's finding that Garcia was not credible was improper.

SSR 96-8p explains how an ALJ should assess a claimant's RFC
at steps four and five of the sequential evaluation.  In a
section entitled, "Narrative Discussion Requirements," SSR 96-8p
specifically spells out what is needed in the ALJ's RFC analysis.
This section of the Ruling provides:

> The RFC assessment must include a narrative discussion
> describing how the evidence supports each conclusion,
> citing specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g., daily
> activities, observations).  In assessing RFC, the
> adjudicator must discuss the individual's ability to
> perform sustained work activities in an ordinary work
> setting on a regular and continuing basis (i.e., 8
> hours a day, for 5 days a week, or an equivalent work
> schedule), and describe the maximum amount of each
> work-related activity the individual can perform based

on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. *See Morphew v. Apfel*, 2000 WL 682661 at *3 (S.D. Ind. Feb. 15, 2000) ("SSR 96-8p does not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis. Rather, an ALJ must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities.").

Garcia argues that the ALJ made an erroneous RFC determination because he did not grant enough weight to his treating physician's testimony, the opinion evidence of the independent consultant examiners, and other supporting medical evidence. Garcia specifically directs the court to consider the open letter written by treating physician Dr. Lucena that addressed Garcia's ability to work, the Medical Assessment of Ability to do Work-Related Activities Form completed by Dr. Lucena regarding Garcia, Dr. Durak's report that assigned Garcia a GAF score of 55, and Dr. Rahmany's report. Garcia argues that the ALJ improperly "cherry-picked" parts of the various

physicians' notes and medical testimony to support his contention that Garcia was able to perform sedentary work.

A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. § 404.1527(d)(2);** *See also* ***Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007); ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford v. Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (*quoting* ***Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992); *See also* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. **20 C.F.R. § 404.1527(c)(2); *Clifford***, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. ***Schmidt***, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is

inconsistent with the opinion of a consulting physician or when
the treating physician's opinion is internally inconsistent, as
long as he minimally articulates his reasons for editing or
rejecting evidence of disability.); *see e.g.* **Latkowski v.
Barnhart**, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); **Jacoby v.
Barnhart**, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Ultimately,
the weight accorded a treating physician's opinion must balance
all the circumstances, with recognition that, while a treating
physician "has spent more time with the claimant," the treating
physician may also "bend over backwards to assist a patient in
obtaining benefits . . . [and] is often not a specialist in the
patient's ailments, as the other physicians who give evidence in
a disability case usually are." **Hofslien v. Barnhart**, 439 F.3d
375, 377 (7th Cir. 2006) (internal citations omitted).

In his opinion, the ALJ stated that he gave considerable
weight to the September 10, 2010 opinion letter prepared by Dr.
Lucena because the findings were consistent with the record as a
whole and supported by objective medical evidence. The ALJ
disregarded one portion of Dr. Lucena's letter, which stated that
Garcia was disabled and unable to perform any function. The ALJ
explained that he disregarded this statement because it
constituted a disability finding. An opinion that a claimant is
disabled need not be considered by the ALJ because disability is
a determination reserved for the Commissioner. **20 C.F.R.**

**404.1527(d)(1).** Therefore, the ALJ did not err in disregarding this statement.

The letter also stated that Garcia should not lift more than 20 pounds and could stand for no more than thirty minutes at a time. Dr. Lucena stated that he based his opinion on Garcia's chronic pain and fatigue. However, this opinion does not conflict with the ALJ's finding. The ALJ limited Garcia to sedentary work, which involves lifting no more than 10 pounds at a time and involves sitting. This is consistent with Dr. Lucena's restrictions.

Dr. Lucena also prepared a report two months later that demanded greater restrictions. Dr. Lucena decreased the amount of weight Garcia could lift to no more than 10 pounds and decreased the amount of time Garcia could stand from no more than thirty minutes at a time to less than half an hour in a total eight-hour day. Dr. Lucena left the spaces blank that asked for the medical findings upon which his assessment was based. Garcia argues that the more restrictive limitations were a reflection of his deteriorating health.

In addressing the discrepancies between the two opinions, the ALJ explained that even if Garcia's health deteriorated over the two month period, Dr. Lucena did not provide any findings, evidence, or explanation for his opinions contained in the December report. The ALJ need not rely on a treating source's

opinion if it is not supported by medically acceptable clinical and diagnostic techniques and is not consistent with other substantial evidence of record. **20 C.F.R. § 404.1527(d)(2).** The ALJ was unwilling to make the assumption that Garcia's condition deteriorated to such an extent and pointed to the lack of any objective medical evidence to show that Garcia's condition deteriorated and demanded such restrictive limitations. Absent any supporting explanation or medical evidence, the ALJ did not err by disregarding Dr. Lucena's opinion. Additionally, the ALJ supported his decisions by explaining that Dr. Lucena's letter lacked information that would suggest that Garcia's limitation dated back to the alleged onset date or had lasted for at least twelve months. Together, the ALJ provided sufficient support for rejecting Dr. Lucena's opinions contained in the December assessment.

Garcia next complains that the ALJ failed to discuss or mention Dr. Durak's Report, in which he gave Garcia a GAF Score of 55, and this resulted in an erroneous RFC determination. The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnosis and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV–TR). The established procedures require a mental health professional to assess an individual's current level of symptom severity and current level of

functioning, and adopt the lower of the two scores as the final score. *Id.* at 32-33. A GAF score ranging from 41-50 indicates serious symptoms; scores ranging from 51-60 indicate moderate symptoms; and scores ranging from 61-70 indicate mild symptoms. *Id.* GAF scores are "useful for planning treatment" and are measures of both severity of symptoms and functional level. *Id.* at 32-34. Because the "final GAF rating always reflects the worse of the two," the score does not reflect the clinician's opinion of functional capacity. "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart*, 69 Fed.Appx. 775, 780 (7th Cir. 2003) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

Garcia was assigned a GAF score of 55, indicating moderate limitations in social, occupational, or school functioning. Garcia points to an unpublished opinion to support his argument that the ALJ should have considered the GAF score of 55 because a score below 51 would indicate a complete inability to keep a job. *Bartrom v. Apfel*, 234 F.3d 1272, n.3 (7th Cir. 2000). In *Bartrom,* the plaintiff was assigned a series of GAF scores that fell well below 55, including scores of 30, 45, and 50. The ALJ did not resolve the discrepancies in the scores or explain why he disregarded the low scores in favor of the high scores.

Here, no such conflict exists.  Garcia was assigned one GAF score indicating moderate limitations.  At no point was his GAF score low enough to suggest a complete inability to work, and because of this Garcia has not shown that the GAF score conflicts with the ALJ's conclusion.  The ALJ only is required to provide a substantial support for his conclusion and confront the evidence that did not support his conclusion. *See Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).  The ALJ need not address all evidence of record.  *Jelinek*, 662 F.3d at 811.  Because the GAF score does not conflict with his conclusion, the ALJ did not need to confront this evidence.

Additionally, in making his RFC determination, the ALJ fully discussed all of Garcia's symptoms and indicated that he fully considered all opinion evidence.  (Tr. 22-26) The ALJ supported his findings by discussing Garcia's medical history, explaining that Garcia did not seek treatment until two years after the alleged onset date, and by engaging in a detailed discussion of the inconsistencies between Garcia's reported activities and reported effects of his medical conditions.  (Tr. 22-26) Although the ALJ did not specifically cite the language from Dr. Durak's medical report, the record reflects that he took these notes into consideration.  Because the GAF score Dr. Durak assigned Garcia

was not inconsistent with his finding and would not control his disability determination, the ALJ did not err in failing to address the GAF score.

Finally, Garcia complains that the ALJ did not assign enough weight to Dr. Rahmany's opinion. Dr. Rahmany stated that Garcia was could not perform functional activity or labor work. The ALJ again explained that this was a conclusory disability opinion that was reserved for the Commissioner, and he went on to point to the inconsistencies between Dr. Rahmany's objective findings and conclusion. The ALJ explained that Dr. Rahmany noted that during his examination Garcia had no abdominal pain, nausea, vomiting, hematemesis, swelling, stiffness, or effusion in either the upper or lower extremities. (Tr. 25) Furthermore, the ALJ explained that Dr. Rahmany noted that Garcia had normal strength in all muscle groups, was capable of walking with a steady gait, could stoop and squat without difficulty, could walk heel to toe in tandem walk without difficulty, and was able to stand from a sitting position without difficulty, which were all observations that were inconsistent with a finding of disability. (Tr. 25) The ALJ pointed to contradictions between Dr. Rahmany's findings, his notes, and the record as a whole, and thus provided sufficient support for his finding that Dr. Rahmany's conclusions were contradicted by substantial evidence in the record,

including Garcia's own testimony regarding his physical capabilities and symptoms.

Next, Garcia argues that the ALJ's step five finding was erroneous. Specifically, Garcia directs the court to consider whether the ALJ ignored the VE's statements regarding an individual's employability who had Garcia's limitations, and whether the ALJ parsed and "cherry picked" through the record to come to his conclusion. Also, Garcia argues that the ALJ ignored limitations incorporated into the hypothetical situations presented to the VE and that the VE only testified to an insignificant number of "1500 jobs" still remaining in the economy that Garcia was able to perform.

In questioning the VE, the ALJ posed a series of hypothetical questions pertaining to the working capacity of an individual with the same or similar limitations as Garcia. (Tr. 28-83) Garcia argues that the ALJ parsed through the record to come to his conclusion by ignoring the VE's statements that an individual with Garcia's limitations and need for extra breaks and missed work days was not employable. However, the ALJ specifically asked the VE in his fourth hypothetical whether a person with Garcia's limitations who could perform only simple, routine, and repetitive tasks was employable. The VE responded in the affirmative, indicating that a person with such functional limitations and requirements was capable of performing more than

15,000 jobs regionally, and over 480,000 jobs nationally.  (Tr.
79-82).  Although the VE testified that a person who needed to
miss more than one day of work per month would have difficulty
sustaining competitive employment, the ALJ's RFC determination
did not include a finding that Garcia's limitations included
missing work on a regular basis.  (Tr. 82) In fact, in his RFC
determination the ALJ recognized that Garcia's pain medications
and symptoms caused fatigue, but the ALJ explained that his
limitation for simple, routine, repetitive tasks was meant to
accommodate for the effect Garcia's medications had on him
throughout the day.  Thus, the ALJ specifically included the
limitation involving simple, routine, repetitive tasks in his
hypothetical situations presented to the VE to ensure that a
significant number of jobs existed in which a person with
Garcia's limitations and functional capacity could perform
without missing many days and requiring more frequent breaks
throughout the day than other employees.  The ALJ correctly found
that there were a significant number of jobs available in the
national and regional economy that Garcia could perform given his
age, education, work experience, and RFC.  (Tr. 27)

Garcia finally argues that the ALJ made an improper
credibility determination.  This court will sustain the ALJ's
credibility determination unless it is "patently wrong" and not
supported by the record.  ***Schmidt v. Astrue***, 496 F.3d 833, 843

(7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility findings in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.")  The ALJ's "unique position to observe a witness" entitles his opinion to great deference.  *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilites rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  **20 C.F.R. § 404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d

697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. § 404.1529(c);** *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also* ***Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v. Barnhart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits.") Rather, if the

> [c]laimant indicates that pain is a significant factor
> of his or he alleged inability to work, the ALJ must
> obtain detailed descriptions of the claimant's daily
> activities by directing specific inquiries about the
> pain and its effects to the claimant. She must
> investigate all avenues presented that relate to pain,
> including claimant's prior work record, information and
> observations by treating physicians, examining
> physicians, and third parties. Factors that must be
> considered include the nature and intensity of the
> claimant's pain, precipitation and aggravating factors,
> dosage and effectiveness of any pain medications, other
> treatment for relief of pain, functional restrictions,
> and the claimant's daily activities. (internal
> citations omitted).

> *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994).

*See also* **Zurawski v. Halter**, 245 F.3d 881, 887-88 (7th Cir.

2001).

In addition, when the ALJ discounts the claimant's

description of pain because it is inconsistent with the objective

medical evidence, he must make more than "a single, conclusory

statement . . . The determination or decision must contain

specific reasons for the finding on credibility, supported by the

evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and

the reasons for that weight." SSR 96-7p, at *2. *See **Zurawski***,

245 F.3d at 887; ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir.

1995) (finding that the ALJ must articulate, at some minimum

level, his analysis of the evidence). He must "build an accurate

and logical bridge from the evidence to [his] conclusion."

*Zurawski*, 245 F.3d at 887 (*quoting* **Clifford v. Apfel**, 227 F.3d 863, 872 (7th Cir. 2000)). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting. *See Zurawski*, 245 F.3d at 888 (*quoting* **Bauzo v. Bowen**, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Garcia argues that the ALJ improperly used boilerplate language without explaining his reasoning, as is required by SSR 96-7p, when he found Garcia was not credible. Garcia points to a single statement in the ALJ's decision, "the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 23) Although the Seventh Circuit has criticized the use of boilerplates, their use is not reversible error if the ALJ further supports his decision with the record. **Yost v. Astrue**, 2012 WL 2814347 (N.D. Ill. July 10, 2010)(citing

*Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011)). In the same section of the opinion where he made his credibility determination, the ALJ discussed Garcia's medically determinable physical and mental impairments, including the claimant's diagnoses of end stage liver disease secondary to alcoholism, severe thrombocytopenia without evidence of bleeding secondary to end-stage liver disease, biliary dyskinesis, hepatitis C, a history of chronic alcoholism, and colitis. (Tr. 23-24) The ALJ also addressed Garcia's daily activities, ability to care for himself, and limitations in performing such activities. (Tr. 22-25) Therefore, the ALJ met his burden by providing more than boilerplate language.

Garcia next complains that the ALJ failed to address his testimony that his symptoms began prior to 2008, ignored his statements that he was able to keep his job because his specialized knowledge made him too valuable despite numerous absences, and did not address that Garcia did not have health insurance, making treatment cost prohibitive.

In the opinion, the ALJ noted that he found no evidence of disability as of the alleged onset date in June of 2008. Garcia continued drinking until June of 2010, after the claimed onset date, he did not seek treatment until two years after the alleged onset date, and Garcia's drinking was a factor for at least a good part of his alleged period of disability, thereby indicating

that despite the fact Garcia claimed he suffered from severe symptoms prior to 2008, he continued exacerbating those health issues by continuing to drink alcohol and by neglecting to seek treatment for two years. (Tr. 24)

In addressing issues pertaining to how Garcia was able to remain employed despite frequent absences from his job prior to the alleged onset date, the ALJ concluded that Garcia's work performance was not affected significantly by a disability, and Garcia was not disabled as of the alleged date of onset. (Tr. 24) The ALJ explained that the record indicated that Garcia did not stop working in 2008 due to a disability but because the company went out of business. Garcia continued to work for cash part-time after August of 2008.  When he stopped working for the company, Garcia was lifting and carrying heavy things while working construction as recently as 2010, and Garcia considered himself capable of attempting demanding tasks.  (Tr. 24) Thus, the ALJ relied on medical evidence as well as Garcia's testimony to conclude that Garcia could perform significantly less demanding work consistent with the RFC assessment.  (Tr. 24)

The ALJ also considered Garcia's daily activities and limitations in making his RFC determination.  The ALJ noted that Garcia did not pursue treatment for his debilitating symptoms for two years after the alleged onset date and continued to drink alcohol.  For these reasons, the ALJ's determination that

Garcia's claimed symptoms that he was experiencing prior to the alleged onset date were not disabling was supported by both Garcia's failure to pursue treatment and Garcia's testimony regarding work history. This indicates that the severity of the pain did not rise to the level to render Garcia disabled. For these reasons, substantial evidence of record supports the ALJ's decision to discredit Garcia's testimony.

The ALJ correctly determined that some of the physician's opinions were inconsistent and contradicted evidence contained in the record as a whole, and adequately articulated his reasons for crediting and rejecting the opinion evidence presented regarding Garcia's claimed disability. In making his RFC determination, the ALJ provided a narrative discussion describing how the evidence supported his conclusions and assessed all of the elements discussed in SSR 96-8p that Garcia argued were improper. Finally, in making his credibility determination, the ALJ considered all of the factors outlined in 96-7p that Garcia complained were not considered provided. His decision is therefore supported by substantial evidence of record, and the decision of the ALJ is **AFFIRMED**.

ENTERED this 27th day of March, 2013

/s/ Andrew P. Rodovich
United States Magistrate Judge